IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville September 16, 2014

**STATE OF TENNESSEE v. ROBERT A. BASS**

**Appeal from the Circuit Court for Maury County**
**Nos. 21710, 22283     Stella L. Hargrove, Judge**

**No. M2013-02717-CCA-R3-CD - Filed October 28, 2014**

The Defendant, Robert A. Bass, was convicted by a Maury County Circuit Court jury of assault, a Class A misdemeanor. *See* T.C.A. § 39-13-101(a)(2) (2014). The trial court sentenced the Defendant to eleven months, twenty-nine days on probation. On appeal, the Defendant contends that the trial court erred by failing to instruct the jury regarding self-defense. We reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Larry Samuel Patterson, Jr., Columbia, Tennessee, for the appellant, Robert A. Bass.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Brent Cooper, District Attorney General; and Kim Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to an altercation involving the Defendant and the victim, Jeffrey Mealer. At the trial, Maury County Sheriff's Deputy Paul Young testified that on February 5, 2012, at 5:45 p.m., he responded to an assault-with-shots-fired call at the Defendant's house. When Deputy Young arrived at the scene, he saw the Defendant, who was holding a telephone, standing in the driveway about twenty feet from the house. He approached the Defendant, took the telephone, and saw a handgun lying on the hood of the car. The handgun was about four or five feet from the Defendant, and the deputy secured it inside his police cruiser. Deputy Sims arrived at the scene to assist. When the deputies frisked the Defendant

for officer safety, they saw other officers and emergency personnel responding to a neighboring house about 100 yards away. The deputies learned the victim was there.

Deputy Young testified that he placed the Defendant in custody for officer safety but did not arrest him. When asked, the Defendant denied being injured. The deputies waited for assistance from additional officers, and the Defendant talked periodically while they waited. The Defendant told the deputies that he saw the victim earlier that day and invited the victim to his house. The Defendant said that he wanted to confront the victim about breaking into his house, that he confronted the victim after he arrived, and that the victim denied involvement in the burglary. The Defendant admitted becoming angry after the victim's denial and said he grabbed a handgun from the top of a cabinet or shelf and struck the victim with it. The Defendant told Deputy Young that the victim ran from the house after being struck and that he chased the victim and fired the handgun at him. The Defendant admitted chasing the victim outside the house, telling the victim to stop running, and threatening to shoot the victim in the leg if he did not stop running. The Defendant also admitted threatening to shoot the victim with a shotgun if the victim ran to the neighboring house. Deputy Young noted that the house to which the victim ran was where the additional officers and emergency personnel responded. He said that the area surrounding the Defendant's house was searched and that a shell casing was found in the roadway. The Defendant's handgun was the only weapon found by the officers.

On cross-examination, Deputy Young testified that he learned later the Defendant and the victim each called 9-1-1. Sergeant Bob and Deputy Parks first responded to the neighboring house but came to the Defendant's house later. Deputy Young did not recall if the handgun's magazine clip was inserted or ejected from the handgun and said Detective Jerry Chandler read the Defendant his *Miranda* rights. He agreed that the Defendant was cooperative and that the Defendant consented to a search of his house. He did not recall if the Defendant said the victim shoved him but knew the Defendant said he threatened to shoot the victim in the leg if he did not stop running away.

Deputy Young testified that the shell casing found in the roadway was smashed or crushed by a car. Shell casings were also found near the steps of the Defendant's house, but Deputy Young did not search the surrounding ground for a bullet "slug." He did not know if a woman and a young child came to the Defendant's house during the investigation.

Maury County Sheriff's Deputy Will Sims testified that when he responded to the Defendant's house, Deputy Young was already there, and the Defendant was standing between the house and a car. Deputy Sims placed the Defendant in handcuffs after Deputy Young told him about the handgun and detained him until they could determine what

occurred. He asked the Defendant if he was injured, and the Defendant denied having injuries.

Deputy Sims provided testimony similar to that of Deputy Young regarding the Defendant's statements at the scene. He noted the Defendant claimed that the victim became offended when the Defendant accused him of breaking into the Defendant's house and that the victim shoved the Defendant. He said the Defendant admitted to hitting the victim in the face with his fist after the victim shoved him and to then grabbing a handgun on a nearby shelf. The victim ran from the Defendant, left the house, and ran to a neighboring house. The Defendant admitted threatening to "get his shotgun" if the victim ran to the neighbor's house. The Defendant said he told the victim that the Defendant did not want the victim's car in his driveway. Deputy Sims agreed nobody but the Defendant was at the Defendant's house.

Deputy Sims testified similarly to Deputy Young regarding the shell casing found in the roadway and added that the casing was found in front of the Defendant's driveway. He recalled additional casings were found but did not recall where.

On cross-examination, Deputy Sims testified that the Defendant was cooperative and was not intoxicated. He assumed that the Defendant hit the victim in the face with his fist after the victim shoved him. He said the Defendant claimed that the argument began in the kitchen, that the victim ran away, and that the Defendant "shot beside" the victim. He agreed that the police recovered a semi-automatic handgun and that a shell casing usually ejected from the side of this type of firearm.

On redirect examination, Deputy Sims testified that his report showed that the Defendant claimed he grabbed the handgun as the victim backed away from the Defendant and that the Defendant fired his handgun as the victim was running away. On recross-examination, he agreed no evidence showed that the Defendant shot at the victim inside the house, although the Defendant said he shot beside the victim.

Maury County Sheriff's Deputy Joey Parks testified that he and Sergeant Bob were the first officers to arrive at the neighboring house where the victim was located. He saw the victim standing in the driveway holding his hand over the right side of his face. The victim's wife, Donna, and the homeowner were also there. The victim was conscious, able to communicate, and upset when he arrived. The victim told him that the Defendant, who he identified as Bubby, "pistol whipped" and shot at him, and he pointed toward the Defendant's house. The victim's face was not bleeding or swollen, but emergency personnel treated the victim and transported him to the hospital.

Deputy Parks testified that he found a shell casing in the roadway between the Defendant's driveway and the neighbor's driveway. Although he did not search the surrounding area or the Defendant's house, he spoke to the victim, who did not indicate whether he had a weapon. He did not find a weapon at the neighboring house.

On cross-examination, Deputy Parks testified that although he asked the victim about the amount of alcohol he had consumed that night, he did not recall the victim's response. The deputy was equipped with a recording device and agreed his conversation with the victim was recorded, although it was not played at the trial. Although he recalled the victim's stating something about the Defendant's shooting a gun and about the victim's car, he did not recall if the victim said the Defendant shot the victim's car or if the Defendant shot in the direction of the victim's car. The victim was concerned, though, that the Defendant shot at his car. He recalled the victim's stating that he previously had reconstructive surgery on his face and that the victim was concerned the Defendant's hitting him had damaged the repairs.

Deputy Parks testified that the shell casing he found in the roadway was intact and that he thought it did not appear to have been run over by a car, although he did not know if it had. He did not think the casing had been in the roadway for a long period of time because it showed no visible signs of corrosion or exposure to the elements. After he talked to the victim, Deputy Parks told Deputy Sims what he learned. He did not speak to the Defendant.

Maury County Sheriff's Detective Terry Chandler testified that the Defendant was in the backseat of a patrol car when he arrived at the Defendant's house. He read the Defendant his *Miranda* rights and spoke to him briefly, and the Defendant consented to a search of his house. Detective Chandler walked through the Defendant's house looking for any other occupants and left through the side door. He did not find evidence of a fight inside the house. Outside the Defendant's house, he noted one shell casing was found near the side porch and doghouse and another was found on the roadway. Photographs of the shell casings found near the side porch and in the roadway were received as exhibits. The handgun had been secured before he arrived at the scene. The Defendant admitted to owning and to firing the handgun that night.

Detective Chandler identified the Defendant's handgun and said it was a .40-caliber semi-automatic weapon with one magazine clip, which contained four unfired cartridges. Although the magazine clip did not indicate the number of cartridges it held, Detective Chandler said it held about nine or ten based on his examination.

Detective Chandler testified that he spoke to the victim at the hospital. The side of the victim's face was red, and he appeared to be in pain. He took a photograph of the victim's face, which showed no blood. The victim was upset and was concerned his jaw was fractured. The victim stated that the Defendant invited him to his house and that the Defendant confronted him about a burglary that occurred at the Defendant's house. The victim's wife wrote the statement for the victim. Detective Chandler left the hospital and obtained a statement from the Defendant.

In the Defendant's signed statement, he told Detective Chandler that the victim came to his house and that he invited the victim inside. The victim told the Defendant that the victim had heard that the Defendant thought the victim was involved in the burglary of the Defendant's house a few years previously. The Defendant's late wife's cancer medication was stolen during the burglary. The Defendant told the victim he thought the victim was involved. The Defendant said the victim then shoved him, causing the Defendant to lose his balance. The Defendant hit the victim in the eye and reached on top of the cabinet to retrieve his handgun. The victim ran down the hall and out of the house, and the Defendant "followed" him. The victim ran to his car, opened the door, and looked at the Defendant. The Defendant "shot in the ground," and the victim ran to the neighbor's house. The Defendant said he "walked around for a while" before calling 9-1-1.

Detective Chandler testified that the Defendant told him that he invited the victim to his house and that he fired his handgun two or three times. The Defendant did not claim the victim had a weapon.

On cross-examination, Detective Chandler testified that the Defendant told him that the victim asked the Defendant about a "joint" before coming to the Defendant's house and that the Defendant invited the victim to his house. Detective Chandler found no evidence of a struggle or that the gun was fired inside the house. He said, though, that he was not inside the house when the Defendant and the victim argued.

Detective Chandler testified that although the Defendant said in his written statement that he shot at the ground, the Defendant told him at the scene that he shot at the victim's car seat and that "[i]f he was going to shoot him, he would have shot him." Detective Chandler agreed the Defendant never said he shot at the victim's feet. He agreed the Defendant's police interview was not recorded. Detective Chandler's supplemental report stated that the Defendant claimed he never attempted to shoot at the victim. The supplemental report showed the Defendant said that the victim pushed him and that he struck the victim in self-defense. On redirect examination, Detective Chandler testified that the Defendant never said he was afraid of the victim.

The victim testified that he had known the Defendant for about thirty years and that they had been friends. The victim was at his son's house when he first saw the Defendant on the day of the incident. They exchanged pleasantries, and the victim asked the Defendant if he had a joint they could smoke. The Defendant said he had one at home, and they agreed that the victim would come to the Defendant's house later.

The victim testified that he drove to the Defendant's house and that initially nobody was home. As he was leaving, he saw the Defendant's truck on the roadway, turned around, and followed it to the Defendant's house. The Defendant invited the victim inside, and they entered the house through the side door. The Defendant's girlfriend and son were with the Defendant, but they did not enter the house. The victim did not know where they went. The victim and the Defendant walked down the hall and entered the kitchen, and the victim saw the Defendant reach on top of a cabinet to retrieve a handgun. He said the Defendant "busted [him] . . . in the face with it" without saying a word. The victim was struck on the right side of his face between the temple and the cheekbone. The victim asked the Defendant what he was doing, and the Defendant hit him with his fist and said, "You son of a b----, you broke into my house." He denied knowing what the Defendant was talking about, and the Defendant said, "I'm fixing to kill you."

The victim testified that the Defendant's hitting him with the handgun "almost knocked [him] out" and that "everything . . . went black" for a few seconds. He denied touching the Defendant and said he believed the Defendant would have shot him if he had touched the Defendant. After the Defendant threatened to kill the victim, the victim ran down the hall, and the Defendant grabbed the victim's shirt collar and hit the victim on the head with the handgun. They struggled and ultimately fell outside onto the porch. They each stood up, and the victim said the Defendant fired the handgun at him from arm's length. Although he did not see where the bullet went, he "felt dirt fly up." The victim feared for his life.

The victim testified that after the Defendant fired the handgun, he told the Defendant he wanted to leave. The Defendant told the victim that he was not going anywhere and threatened to shoot the victim if he attempted to walk to his car. The Defendant continued to accuse the victim of breaking into his house, and the victim continued to deny it. The victim began to back away slowly from the Defendant and walked out of the Defendant's driveway and onto the roadway. As the victim backed away, the Defendant continued threatening to shoot and to kill the victim. The victim told the Defendant that the Defendant would have to shoot him in the back. He then turned around and ran to the neighboring house. The Defendant, who was standing in the roadway, fired the handgun again as the victim ran away. The victim thought the Defendant was going to kill him.

-6-

The victim testified regarding his injuries. He suffered broken bones to the face and underwent two surgeries to insert three plates and twenty screws in his face. He said the doctors had to "rebuild" his eye socket. About three weeks later, he had five teeth removed. He said his doctor bills totaled approximately $130,000. He received financial assistance from the "victim's crime fund" and had a pending civil lawsuit against the Defendant. He admitted having previous convictions for theft and aggravated assault but denied drinking alcohol or possessing a weapon on the day of the incident. The victim said that before the day of the incident, ten years had passed since he last saw the Defendant.

On cross-examination, the victim testified that after he arrived at the Defendant's house but before he talked to the Defendant, the victim's son told him on the telephone that the Defendant thought the victim was responsible for the home burglary. He agreed that when he entered the Defendant's house, he told the Defendant that the victim's son told him the Defendant thought the victim had broken into his house. He agreed he did not mention his asking the Defendant about the burglary on direct examination.

The victim testified that the Defendant obtained the handgun from the top of a cabinet, although his written statement showed he said countertop. He denied having a conversation with the Defendant about the victim's stealing the Defendant's late wife's prescription medication. He admitted smoking marijuana before going to the Defendant's house that day. The victim agreed his written statement did not include his and the Defendant's falling onto or off the porch but said his wife wrote the statement. He agreed, though, that he signed it. He estimated the Defendant was about three feet from him when the Defendant fired the first shot, but he was unsure if the Defendant pointed the handgun at him. He denied shoving the Defendant.

Holly Pewitt, the Defendant's girlfriend, testified on the Defendant's behalf that she lived with the Defendant and that the victim arrived at their house about two minutes after she, the Defendant, and the Defendant's son arrived. She said the victim asked the Defendant if he could come inside the house. As she and the Defendant's son began to leave in the Defendant's truck, she saw the victim standing on the porch at the side door. She denied talking to the victim. When she and the Defendant's son returned, the police were there.

The Defendant testified that he had known the victim at least thirty years but that they were not good friends. The Defendant last saw the victim three years before the incident. On the day of the incident, he first saw the victim at the victim's former wife's house. The Defendant was there to talk to David Wiley, who lived with the victim's former wife, about work. He said that when he arrived at Mr. Wiley's house, the victim was sitting inside his car. They exchanged pleasantries, and the victim asked the Defendant if he had a joint. The

Defendant told the victim that he might have one at home, and the victim asked if he could "smoke one" with the Defendant. The Defendant told the victim to come to his house later that afternoon. The victim was still in his car when the Defendant left.

The Defendant testified that he and Ms. Pewitt picked up his son and went home. When they were getting out of the truck, the victim pulled into the driveway. Ms. Pewitt took the Defendant's son to the store because the Defendant thought the victim "was going to . . . start something." The Defendant and the victim entered the house through the side door and walked to the kitchen. The Defendant said the victim asked, "You think I'm the one [who] broke into your house?" The Defendant told the victim that he thought the victim was involved, and the victim then shoved the Defendant. He said the closed laundry room door prevented him from falling. The Defendant saw the victim preparing to "swing" at him and "swung . . . [his] left fist and hit" the victim in the eye. The victim stumbled backward, and the Defendant reached two or three feet away on top of the cabinet for his handgun because the Defendant feared the victim had a knife or weapon. The Defendant knew the victim was previously convicted of aggravated assault and had previously pulled weapons on others. The Defendant denied striking the victim with the handgun and denied grabbing him while inside the house.

The Defendant testified that the victim ran down the hall when he saw the Defendant's handgun and that he followed. When the Defendant stepped onto the porch at the side door, the victim was opening his car door. The victim "leaned down and . . . looked up" at the Defendant. The Defendant thought the victim was reaching for a gun because the victim had "pulled handguns" on others previously. He feared for his safety, and he pointed the handgun toward the ground "beside the porch" and fired it. He was standing on the porch when he fired the handgun and said it was a warning for the victim to leave. He fired the handgun because it looked as though the victim was reaching for something inside the car.

The Defendant testified that after he fired the handgun, the victim began walking away from the Defendant's house. The Defendant said he told the victim to leave multiple times. As the Defendant was telling the victim to leave, the victim said he was afraid the Defendant was going to shoot him. The Defendant said he told the victim, "If I wanted to shoot you, I would have shot you in my house." At that time, the Defendant said he was standing almost in the yard near the driveway because he wanted the victim to have "plenty of room to get . . . in his car and leave." He was about thirty feet from the house. The Defendant fired his handgun at the ground again when the victim began running toward the neighboring house. He said he became angry and "just shot" the handgun. He said he was close to the roadway when he fired the gun, and the shell casing fell onto the roadway.

The Defendant denied chasing the victim down the roadway and testified that he only fired two shots toward the ground. He denied that grass flew up and hit the victim as a result of his firing the handgun. He said the victim raised the topic of the burglary, and he denied luring the victim to his house to discuss it. After the victim left, the Defendant called 9-1-1, removed the magazine clip and the chambered cartridge from the handgun, and placed the gun on his car. He spoke for about fifteen to twenty minutes with the sheriff's deputies who came to his house. He denied drinking alcohol, using drugs, and intending to harm the victim.

On cross-examination, the Defendant testified that although he could not recall when he heard the victim might have been the person who broke into his house, it was not the day of the incident. He denied thinking about it when the victim came to his house but admitted he probably was going to ask if the victim was involved. He admitted he did not tell the deputies that he sent Ms. Pewitt and his son to the store because he feared what the victim might do. He denied bringing the victim into the kitchen because his handgun was above the kitchen cabinet and said he routinely went to the kitchen when he arrived home.

The Defendant testified that he did not recall telling the deputies that the victim shoved him hard enough to knock him into the laundry room door or his almost falling to the floor. He denied that his hitting the victim caused the victim to need metal plates and screws inserted in his cheek. He said those injuries were from a previous altercation occurring years earlier in which the Defendant was present but not involved.

The Defendant testified that he did not grab the victim as he ran down the hall. He denied threatening to shoot the victim in the leg if he did not stop running away but said he might have threatened to shoot the victim if he did not leave his property. He agreed a photograph of the Defendant's driveway showed the victim's car doors were closed and said he could not recall who closed the driver's door. Although he fired his handgun when the victim opened his car door, the Defendant said the victim was free to leave in his car. He did not recall telling the 9-1-1 operator, "If [the victim] had had a gun, he would have pulled it after I pulled my gun." He believed, though, that if the victim had a gun, it was probably in the victim's car. He did not recall if he unloaded the handgun and placed it on his car before or during his conversation with the 9-1-1 operator. Although he did not recall telling the 9-1-1 operator that the victim was lucky because he did not "hurt [the victim] bad," he said it was possible he said it.

Upon this evidence, the jury found the Defendant not guilty for the events occurring inside his home and convicted him of assault for the events occurring outside. The trial court sentenced the Defendant to eleven months, twenty-nine days to be served on probation. This appeal followed.

The Defendant contends that the trial court erred by refusing to instruct the jury on self-defense. He argues the evidence supported the instruction when viewed in the light most favorable to the Defendant. The State responds that the trial court properly denied the Defendant's request for the instruction.

A criminal defendant has "a right to a correct and complete charge of the law." *State v. Hanson*, 279 S.W.3d 265, 280 (Tenn. 2009) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). As a result, a trial court has a duty "to give proper jury instructions as to the law governing the issues raised by the nature of the proceeding and the evidence introduced at trial." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citing *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). A jury instruction related to general defenses, including self-defense, is not required to be submitted to the jury "unless it is fairly raised by the proof." T.C.A. § 39-11-203(c) (2014). An erroneous jury instruction, though, may deprive the defendant of the constitutional right to a jury trial. *See Garrison*, 40 S.W.3d at 433-34.

Our supreme court has concluded that sufficient evidence to fairly raise a general defense "is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. A trial court's determination in this regard "must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id.*; *see State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001); *Johnson v. State*, 531 S.W.2d 558, 559 (Tenn. 1975); *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); *see also State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to appropriate instructions." *Johnson*, 531 S.W.2d at 559.

When the evidence presented at the trial fairly raises a general defense, the trial court is required to provide the jury with the appropriate instruction. *Hawkins*, 406 S.W.3d at 129. A jury instruction, though, is "prejudicially erroneous only if the . . . charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

With respect to self-defense In Tennessee, a person acts in self-defense when that person

> is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if: (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury; (B) The

danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C) (2014).

Regarding the Defendant's request for a self-defense instruction, defense counsel argued at the trial that the evidence supported the instruction when viewed in the light most favorable to the Defendant. Counsel argued the Defendant's testimony regarding the victim's shoving him and the victim's preparing to strike him when the Defendant hit the victim in the face with his fist showed the Defendant feared serious bodily injury and acted in self-defense. Counsel noted the Defendant knew of the victim's carrying weapons and previous aggravated assault conviction and argued it was a question of fact for the jury to decide whether the Defendant's conduct and force were reasonable. Likewise, counsel argued that the Defendant believed the victim was reaching for a weapon inside his car when he fired the first round outside the house, which also fairly raised the issue of self-defense.

The trial court stated that "propensity for violence [was] one factor" to consider but that the other relevant factors to consider when deciding whether to provide a self-defense instruction were not present in the facts of the case. The court noted no previous threats existed, no evidence of the victim's animosity toward the Defendant was presented, and no evidence of the sizes and strengths of the parties was presented. Defense counsel argued that if the jury rejected the victim's testimony that the Defendant struck him with the handgun, it could conclude that the Defendant was guilty of the lesser included offense of assault. Counsel also noted self-defense was a defense to assault and argued that if the jury believed the Defendant's testimony regarding the events inside the house, the jury could find that the Defendant reasonably was in fear of the victim.

The trial court expressed skepticism about the Defendant's knowledge of the victim's propensity for violence before the incident. Defense counsel informed the court that he investigated the victim's criminal history based on information provided by the Defendant at their first meeting, not information from the prosecutor. The court, though, expressed concern regarding the Defendant's telling the victim to leave but firing the handgun when the victim attempted to get in his car and the Defendant's firing the gun when the victim ran away. Counsel argued it was for the jury to determine whether it believed the Defendant's or the victim's testimony.

The trial court found that the evidence presented at the trial did not rise "to the level of self-defense." The court stated it was difficult to find that the Defendant had a reasonable belief of an imminent danger of death or serious bodily injury, that the Defendant's fear was

real or honestly believed at the time, and that the fear was based upon reasonable grounds. Although the court noted that whether a self-defense instruction was warranted depended upon what the Defendant thought was "real or could happen," the Defendant's fear had to be founded upon "reasonable grounds." The court refused to include a self-defense instruction.

Although the Defendant was acquitted of any wrongdoing for the events inside his house, we consider those events as part of the totality of the circumstances in determining whether a self-defense instruction was warranted by the evidence. In the light most favorable to the Defendant, the evidence shows that the Defendant was inside his house and on his property when the first incident occurred. The Defendant testified that he invited the victim to his house and that when the victim entered the house, the victim asked the Defendant if the Defendant thought the victim was involved in the burglary of the Defendant's house that occurred sometime before the incident in this case. The Defendant admitted that he thought the victim was involved, and the victim shoved the Defendant. The Defendant would have fallen to the floor, but the laundry room door prevented his falling. As the Defendant saw the victim preparing to "swing" at him, he hit the victim in the face. As the victim stumbled, the Defendant reached for his handgun on top of the kitchen cabinet because he feared the victim possessed some kind of weapon.

We note the Defendant's testimony that he knew of the victim's previous aggravated assault conviction and of the victim's previously pulling weapons on others. We note, too, that the Defendant sent Ms. Pewitt and his son away from the house because the Defendant thought the victim "was going to . . . start something." The Defendant testified in response to the prosecutor's question about self-defense that he was scared of the victim and said, "I know his history and I didn't know if he had a gun, or a knife, or what."

In further support of our conclusion, the record shows that during deliberations, the jurors asked if they could consider whether the Defendant "hit him in self-defense." The trial court replied, "You have heard all the proof and the court's charge." Although the Defendant was indicted for aggravated assault for his conduct inside the house, the jury acquitted him of any wrongdoing for that conduct. This implies that the jury credited the Defendant's testimony and version of this incident.

The evidence, likewise, shows in the light most favorable to the Defendant that after the Defendant struck the victim in the face, the victim fled the house and ran to his car. As the Defendant stepped onto the porch, he saw the victim opening his car door. The victim "leaned down and looked up" at the Defendant, which prompted the Defendant to think the victim was reaching for a firearm because the victim had "pulled pistols" on others previously. The victim's conduct inside the Defendant's house and the Defendant's

knowledge of the victim's violent history caused the Defendant to fear for his safety. Because the Defendant believed the victim was reaching for a firearm, the Defendant fired a warning shot toward the ground. The Defendant denied that grass hit the victim as a result of his firing the handgun, and the testimony showed the Defendant was on his porch when the shot was fired. We note the Defendant's statement to Detective Chandler was consistent with his trial testimony. The Defendant told the victim to leave multiple times. Although the warning shot might have prevented the victim from entering his car, the victim walked down the Defendant's driveway. The photograph of the victim's car showed that the doors were closed. The Defendant testified that the driver's side door was open but that he could not recall who closed it or when. The Defendant explained the second shot was fired after the victim began to run toward the neighboring house, was fired at the ground, and was a result of his anger regarding the incident. The Defendant denied chasing the victim down the roadway, firing the handgun at the victim, and intending to harm the victim.

The Defendant presented sufficient evidence in which reasonable minds could accept self-defense and was entitled to the relevant instruction. *Johnson*, 531 S.W.2d at 559. The Defendant's proof, if credited, sufficiently presented questions of fact for the jury to determine if the Defendant held a reasonable belief that the victim posed an imminent danger of death or serious bodily injury, if the Defendant used reasonable force, if the danger was honestly believed to be real by the Defendant, and if the danger was founded upon reasonable grounds. *See* T.C.A. § 39-11-611(b)(2)(A)-(C). As a result, the jurors could have considered the Defendant's use of force and all the facts and circumstances surrounding and leading up to the force he used outside the house. Pursuant to the relevant instruction, the jury would have been permitted to consider factors such as the Defendant's knowledge of the victim's character for violence and any implied or inferred animosity of the victim for the Defendant as a result of the previous burglary. *See* T.P.I. - Crim. 40.06(b) (17th ed. 2012). Although the pattern jury instruction provides a list of additional factors for the jury to consider, the list is not exhaustive. *See id.*

We note that the trial court's refusal to grant the Defendant's request for an instruction on self-defense appears to center on the credibility assessment of the testifying witnesses, rather than an examination of the admissible evidence in the light most favorable to the Defendant. However, conflicts in the evidence and questions regarding witness credibility are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "In determining whether evidence fairly raises an issue, trial courts must assess the defendant's position without ascertaining its truthfulness or the weight to which it might be entitled." *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993).

Although the court might not have credited the Defendant's testimony regarding his belief that the victim was reaching for a gun inside his car, the Defendant's prior knowledge

of the victim's violent proclivities, or the Defendant's stated fear of the victim, the Defendant's testimony still shows a basis for his fear at the time. "[S]elf-defense is not limited to the exact moment of the assault that may be considered in connection with the entirety of the events leading to the assault." *Id.* at 727. The Defendant's stated fear considered in conjunction with his knowledge of the victim's violent propensities entitled the Defendant to an instruction on self-defense, and the denial of his request prevented the jury from considering the merits of his claim. "[S]elf-defense is a complete defense to crimes of violence." *State v. Alexis Mason and Terrence Harris*, No. W2010-02321-CCA-R3-CD, slip op. at 16 (Tenn. Crim. App. Mar. 27, 2013), *perm. app. denied* (Tenn. Sept. 16, 2013). As a result, we reverse the Defendant's assault conviction and remand the case for a new trial.

Based on the foregoing and the record as a whole, we reverse the conviction and remand the case for a new trial on the charge of assault.

_____
ROBERT H. MONTGOMERY, JR., JUDGE